We will be hearing argument in Schafenberg v. Saul. Let me make sure that the attorneys are here. Mr. Gordon. Yes. Yes, your honor. OK, great. You can see and hear the panel. All right. I can. Good. And Mr. Jewett. Yes, sir. I'm here. OK. And you can see and hear us. All right. Yes, sir. All right. So before we begin, just some quick ground rules. We're doing this, of course, via Zoom, which has worked very well. I think I think we're all almost surprised at how well it has worked. There are always. Well, there is the potential for a glitch of some kind. If for whatever reason you find that you get bounced from this Zoom conference, just try to get right back on. We'll wait. We have great technical people who are standing by. And so far, this has almost never happened. And we've always recovered very, very quickly. But don't panic. We've done it and seen it before. Mr. Gordon, you've got 10 minutes. You've reserved three minutes for a rebuttal. So the floor is yours. Thank you, Mayor. Please, the court. Thank you, your honor. This is a social security disability case. It's a little unusual in this in the sense that we are not arguing that the claimant should be found disabled at this point. Rather, we are arguing that the administrative law judge erred in failing to find that the claimant had a severe condition, which, as the court knows in the social security context, doesn't have its normal is not what we would normally think of severe, but rather is simply a condition which in some way limits the person's ability to work. And in this case, I'm sorry to interrupt, but we've said that it's step two. The standard is basically that's a de minimis standard. The de minimis standard. Thank you, your honor. That is the standard. They call it severe, but it's actually defined as de minimis. In this case, we have two medical opinions. They are both the commissioner's consultants. One actually saw the claimant. That would be the psychologist Amanda Sloack. She felt that the that a he had severe. She had severe conditions, but more importantly, that the limitations were up to market, which is a the highest standard. You have the none, the mild, the moderate and then the market. And so she had in some areas moderate, but in some areas up to market, which certainly when it goes back, we would argue that the administrative law judge, once they properly find that the conditions were severe, would also find that Dr. Sloack's opinion is the one that should be given the greatest weight. And of course, I'm sorry to interrupt. So, I mean, Dr. Sloack never met with Ms. Schaffenberg, right? Yeah. Dr. Sloack was the examining. Right. And so Dr. Sloack, you know, the opinion was based on a single examination by somebody else without the benefit of treatment records, right? Dr. Sloack. Right. Dr. Sloack was a standard examination and the non-examiner. Can I be clear? Dr. Sloack did examine your client, right? Correct. One time. Correct. Right. OK. But it was it was Bootwala who did not examine. Correct. But Bootwala had had the medical records. And the bottom line is that both of the defendants, both of the commissioner's own examiners, found that she met the de minimis standard. They know what severe means in Social Security, whereas a non-employee, a non-medical employee might not. But they did. And they both said that she met him. And they both said that in the critical areas of trying to continue to work and we can argue and we argued in there that it's consistent, that she would have that she would not be able to work consistently with the question being how much time she would not be able to work. Just even doing the her regular non-work activity of watching her sister and her mother. She couldn't even do that. Every time she did that, she would she would get worse. And every time that she put it, put it back, she would get a little bit better. So that seems to me you're suggest it seems to me that the AOJ relied on that to essentially disagree with the medical experts that because she was taking care of her mother and her sister, that that showed that she didn't have significant limitations in her ability to work. And you're saying that's wrong from the medical records and it's beyond the minimum standard. Is that essentially what you're arguing? Right. We're arguing two things. One, we're arguing that the ability to care for one's sibling or one's parent in a you know, there's no there's nothing to show that she would do it eight hours a day, five days a week. So, number one, and there are a number of cases that say that daily activities such as that do not equate with work where you have to be with other people and you have to deal with other people. But we also we also show and especially in our reply brief over and over again in the medical records. And I can do it if you want. But over and over in the medical records that that this is a stressor and that she can't handle it. And that every time she is given a break from doing it, that she gets a little bit better. And then when she has to do work activity that although is not full time and doesn't coincide with with work in it, that there would be a significant number of jobs. She gets worse. So we actually think that the record that the record shows that when she tries to do anything that even remotely comes close to work activity, she gets worse. And I have a question. I have a question that goes to the standard here, and that is which I didn't think was fleshed out very well. And partly that's, I think, our fault. But to overcome a treating physician, we don't have a treating physician here. But to overcome a treating physician, the LJ has to find overwhelmingly compelling circumstantial evidence where there's no no there's no doctor supporting, supporting the position of the LJ where you're dealing with and examining non-treating such as slow it. Not quite clear in my mind whether the standard here is overwhelming and compelling or clear and convincing to overcome that, overcome that testimony. Yeah. And then where you're dealing with a non-examining, non-treating like Wala, it's not clear what the standard would be to overcome that. Presumably, they would be lower than the standard required than the test for overcoming the treating physician. But do you know any Second Circuit case that deals with these various standards, particularly where you're not dealing with a treating physician? Yeah, we forgive me. I we did we did cite it in our brief. The problem is that it's consistent with the only records of opinion, which are the defendant's own opinion. So you've got to wreck two opinions in there. Forgive me. I'm trying to find it real quick. And I focus on the other part of it. I'm just thinking of the legal standard. Yeah, exactly. Exactly. And and we had forgive me. I may I may have to do it on rebuttal because I have it in my brief and I looked at it this morning. But then I spent the rest of my time really on the on the fact that. Why don't you address it on rebuttal? OK, I guess I just wanted to follow up a little bit. I mean, the ALJ did refer to the claimants treating providers. I mean, there were people who were seeing your client with some frequency. And so the ALJ relied on those treating providers experiences, which described your client as highly functioning. Right. Sometimes. Sometimes. Yeah. And that's the that's the nature of psychiatric impairments, is that. And that's the whole argument here is that it is sometimes that especially like Dr. Slovak indicates bipolar. Well, when you're not in the depressive state, when you're not in a manic state, you are functioning. The question is when you're not functioning and they both say moderate to marked times that you're not functioning. You either can't go in at all or you're off task for part of the day and then you get the vocational expert, which, of course, wasn't obtained here because they didn't even find a severe impairment. Vocational experts, they're not totally uniform, but off task. Some say 5 percent, some say up to 10, 20 percent. But it's in that area. And days missed, some say 60 years, some say up to 24 year. But in any event, we would have to get a vocational expert to give that testimony. And then the judge would have to decide whether in those periods that she wasn't doing as well, whether she would be able to work consistently. If you're moderately impaired, then you are severely impaired. Is that correct? I would say so. Certainly. I mean, no, isn't that the law? I thought that the various standards, mild, moderate, marked and extreme, that marked was clearly severe. Moderate is also considered severe for the de minimis review. And step two, I am not mistaken. I agree. A hundred percent, judge. I forgive me. I did not quite understand. OK, yeah. No, I just think I'm trying to think through the various levels because moderate sounds moderate. Right. But I understand that it's step two. It's treated. It's treated differently. There's actually four different standards because sometimes it's none. None is certainly not, you know, it's certainly de minimis. If Dr. Slovak or Dr. Buola had said none. And sometimes they say no severe impairment because they know what severe means. Neither one did that in this case. So you got none, you got mild and then you got moderate and marked. And so moderate for certain. And then Dr. Slovak at least goes all the way up to mark, which, you know, we're hoping that upon, you know, if this is sent back, you know, hopefully we get a treating source who now was able to do this. But even if not, you know, that that the moderate impairment would have off task of whatever, 10, 15 percent. And then you get the VE to say yes or no in terms of whether she can work. And the number of days missed the IJ also relied on her, her, her statements that she felt pretty good on a lot of occasions. She did. And what is that? What is that? Where does that leave us? First of all, can you rely on the person who is mentally ill? How reliable is that testimony? And secondly, what do you make of that? If it is, if it can be relied on. Well, the first question is, can you rely on it? And sometimes you absolutely can't because, you know, it's like the person who is paranoid. Everybody is really out to get them. I mean, they don't have an illness. Everybody is really out to get them. So you have to go with the psychiatrist who say, no, you're paranoid. But but on top of that, if you and we did this, especially in the reply brief, the time she feels better is when she stops doing activity that might be analogous to work. Every time that she, you know, she cuts back or stops doing analogous. It is not work activity, but at least analogous to work. She is. She gets a little bit better and then she gets a little bit worse when she has to do it. That was that's in our reply brief. Forgive me. Pages six through eight. But we also also noted times where she is a little bit better. You also noted that she did testify that even with the medications, she has nausea and panic attacks or hallucinations two or three times a month and that they can last two days. So she did testify that she does have issues even on the medication. She she did. And and again, it's it's the inconsistency of ability to work when she's having those panic attacks. She can't when she's not, you know, then all the records show she's good. But when she is, she's I mean, there's two, three days a month. There's no vocational expert in the world that will say anything over two days a month. And that doesn't even take into account the off task. All right. Well, you've got three minutes for rebuttal. So let's thank you. Let's not hear from Mr. Jewett. Thank you, your honors. May it please the court. I represent the commission commissioner of Social Security. Your honors, this case tests a simple principle. Whether the ALJ may find an impairment non-severe when the vast majority of the evidence so indicates. Under the deferential standard of review, the court should affirm the commissioner's decision. First, Ms. Schaffenberg failed to demonstrate that her mental mental impairments were severe. While the commissioner recognizes that courts have found the burden at step two is low, that burden still exists. And here a reasonable reading of that evidence is that her mental impairments do not cause significant limitations in her mental ability. That's a very general that's a very general way of looking at it. But it seems to me that this is much more nuanced when you're dealing with the with the non treating physicians. And one of whom was did an exam and one of them, one of whom didn't. And it's fair to say, I think, that the IJ had to did not agree with those physicians. Correct, your honor. And but what was the standard? What was the standard that the IJ was using when the IJ reached that conclusion? Your honor, I understand your question that you put to Mr. Gordon as well to me about what exactly is the standard for, in effect, overruling a non treating physician. And your your standard of review is governed by that same substantial evidence standard under Section four or five G of this of the Social Security Act. The findings of the commissioner as to any fact is supported by substantial evidence shall be conclusive. That is the ALJ's findings. That would apply. That would apply if you were talking about a treating physician. Right. I mean, your honor, the regulations carve out the regulations, carve out special solicitousness of those treating physicians opinions. They do not. But you're saying that this is like lay testimony then. No, your honor. Of course not. And and certainly had the had the. Had this been a case where let's let's say we're talking about musculoskeletal impairment. Right. And the the medical the the consulting doctor takes a look at the MRI and sees what that finding says and says, you know, based on my experience, someone who with this level of with these exact findings, we're going to say, you know, can't walk more than four hours per day here. By contrast, we have to we have to non treating physician opinions and the ALJ by regulation has to consider the whole record. And they they are not required by the regulations to interpret, to weigh all of the evidence together. So when the we're not talking at this stage whether she can work or not, we're talking about what the impairment is. Does the impairment meet the de minimis level of being a a severe impairment for purposes of step two only? Correct. You know, I it's entirely possible that if we were to remand and set forth the appropriate standards, whatever they may be, that ultimately when when she gets a step, I don't know if this is a listed impairment or not, but if it isn't, then there could easily easily be a finding perhaps that that there is work out there for her that she could do. I just don't know. And we're not involved. That's not part of our observation. Yet that seems to be the thinking that pervades pervades the IJ's opinion. Well, your honor, again, the ALJ is required to consider the entire record in making those determinations. And in doing so, he has access not just to those two opinions, but to the dozens and dozens of treatment notes that say no depression, minimal depression. But your adversary pointed out there are portions in those records that say she's having significant problems. You can't cherry pick the records where she says she's doing OK and ignore the ones where it shows that she was having problems. And I would argue, your honor, that the ALJ did not. The ALJ notes. He he he disagreed with the experts who also had those records, right? The experts had those records, right? The the experts in this case treated, treated, mischief or examined him as Schaffenberg on a single occasions. And they have the records. Well, let me let me get there, your honor. The Dr. Budwala gave his opinion in May of 2015. The ALJ had records through July of 2017. And those records consistently over and over and over again show minimal depression, no depression, anxiety, better with treatment. Her her medication is working well. Her medication reduces her symptoms. Then the ALJ gets to gets to talk to the claimant, Ms. Schaffenberg herself, who comes in and who get the ALJ, gets to see the claimant up close, as the court put it in. But the ALJ is not a doctor or psychiatrist. You know, it's it's you're saying that, well, in effect, the ALJ was an examining physician. The ALJ is permitted to take their observations into. Of course, they're permitted to take their observation into account. But you have, as as Judge Bianco has pointed out, you have two experts who are reaching different conclusions and they are trained psychiatrists. Well, so. Answer the answer, Judge Walker, then I have a question. I mean, yes, your honor, he he is drawing a different conclusion, but he's doing so based on his review of the entire record, including her testimony at the hearing. I'll point you to page 43 of the record where Ms. Schaffenberg says that with medication, she does not have psychiatric symptoms. Mr. Jewett, the next page, page 44, she clarifies. The lawyer says you misunderstood my question. You're not listening. And she clarifies that with the medication she experiences nausea or panic attacks or hallucinations two or three times a month. They can last about two days. So in the very next page, she made clear that even with the medication, she has problems. But your honor, that's for the ALJ to be the fact finder of those issues of. Is it the government's position that if you're taking care of a mother who has dementia or mentally ill sister that you cannot satisfy step two? Because that seems to me. Of course not, your honor. Just in this case, the ALJ is weighing of the evidence, which is entitled to a very deferential standard overview found determined that it was. To where it's a de minimis standard that you let me ask you this. Dixon, we decided Dixon 25 years ago and we said how de minimis this standard is. Do you have a single case in the last 25 years where we have affirmed a finding by an ALJ at step two that it was not severe? A single case. I couldn't find a single case in 25 years. There was one in our brief, I believe, your honor. You cited a circuit case where the medical opinions came out against the prosaic. What again? There was nothing zero to support for Queen. That's the case that you cited. Right. Which was a summary order and was completely different from this. We have two experts supporting the claimant. So that just shows you how extraordinary it is. Maybe you can correct me if I'm wrong. My understanding is that the ALJs, even when they find step two is not met, regularly go on to the other steps and analyze why they think the claimant is not disabled under the subsequent steps. Isn't that what usually happens? It's permissible, but it's not required, your honor. I don't know. Why is there no case in 25 years? Because, your honor, I would point you to the ones that survive step two and that where the ALJ overruled even treating physician opinions in the RFC determination. We pointed to, in our brief, Corbiere, Monroe, Pelham. That's the case. Yes, we're talking about a different step in the sequential evaluation, but we're talking about overruling even a treating physician's opinion, Monroe in particular. I'd call your attention to that one. Where the evidence in the record demonstrates the whole record, including that testimony, the ALJ is permitted to overcome even a treating physician opinion to the contrary. When the ALJ said nothing in the records indicates mental illness on the claimant's part, that's incorrect, right? I mean, everybody agrees she had bipolar disorder, right? Your honor, the treating physician notes, I'll refer you back to those treating physician notes. Look at what Dr. Marte says. Reading what Dr. Marte says about this appellant makes clear that the ALJ's factual findings are supported by substantial evidence, even if there is other evidence that could support the treating physician's opinion. Dr. Marte said she doesn't have bipolar disorder? Dr. Marte says at most mild symptoms and she's generally functioning pretty well. And having begun at the level of mild symptoms, he consistently finds improvement over time. But that's her symptom. She still had bipolar disorder, right? Right, but a diagnosis alone is insufficient to render someone disabled. I understand that, but I'm just saying what the ALJ said there is just incorrect. She has mental illness. The question of how it's affecting her is obviously a different question. Your honor, the ALJ did find that her mental illness was a medically determinable impairment. He's not saying that she has no medically determinable impairment. He's saying it didn't reach that step two standard. But you would agree that whether she's disabled or not is a separate question? Yes, your honor. We're just talking about the impairment. A minute ago, you used the word disabled, which really is invalid. One last point, your honor. The consideration of mental illness under the regulations is complicated. And so the regulations provide for the special technique as an additional procedure to ensure that the assessment of severity at step two is supported. The ALJ did so here, going through the so-called paragraph B criteria, understanding, remembering, and applying information, interacting with others, concentrating, persisting, maintaining pace, all of which he found mild, and adapting and managing oneself, he found no limitation. That's on page 32 of the record. The regulations provide for this extra step precisely because mental impairments are complicated. And the ALJ did so here. And those findings are due every bit as much deference as any other factual finding. Thank you, your honor. Just so I'm clear, then, I think so. Your argument with respect to Dr. Slowick is that Dr. Slowick didn't, I think you said, didn't have the benefit or didn't review Schaffenberg's treatment records. Is that accurate? Yeah, she had no treatment records, I believe, and certainly none beyond early 2015. Which showed, documented, continued improvement over that. And further, as we noted in the brief, Dr. Slowick was of the opinion that Ms. Schaffenberg's intellectual functioning was below average, and certainly that contributed to her findings, her assessment that Ms. Schaffenberg was so limited. The treatment records, far and away, document otherwise. Good cognitive and intellectual functioning by her treating sources over and over and over again. And the ALJ is required to consider the whole record in weighing all that evidence. And the weaknesses or the reasons not to give weight to Dr. Bukwala, according to the ALJ, and I guess according to you, is that Bukwala never examined Schaffenberg and made a diagnosis in 2015 as opposed to 2017 when there was a fuller record. Is that a fair characterization of your argument? Yes, Your Honor, plus consistency with the entire record is another relevant factor here. And then I guess the point that Judge Bianco made about, sort of a strange statement, that there's nothing in the record indicating mental illness on the claimant's part. So are you saying that that was just sort of inartfully stated or it was a stray remark? I'm trying to understand sort of what is your explanation for that statement. I can't say that I understand that exact sentence either, Your Honor. But having found that this was a medically determinable impairment and having noted in the ALJ's opinion all the other allegations of greater impairment, I would just say that that is an erroneous stray remark. He probably left out the word severe or something like that, but that to me is just speculating. All right. Well, thank you very much. We'll now hear from Mr. Gorton for three minutes of rebuttal. Thank you, Your Honor. Thank you, Your Honor. I think everything was flushed out factually. You did ask one of the court asked about the standard. And I did. I did find the argument that we made. It's 12 and 13 of our brief. It's the getting case. Getting versus Astro 333 F Appendix 649. Six and then specifically on 651 on the quote that I'll read from the Second Circuit, although it was a summary order. But that was that in that case, we only had a non examiner. Here we have two. We have the examiner and the non examiner. We don't know what the examiner records they had or didn't have. We just do not know that. We know the non examiner had the records. We know that the examiners actually saw her in this case with only one. And that's the non examiners. Dr. Hargraves and an examiner. Forgive me. It only examined gettings once, not in terms of the deference of a treating physician, which we certainly agree. But what they said is that the ALJ did not refer to any medical opinion, which contradicted the opinion of the one time examiners. And as they and and then then it goes on to say, and I'll read it as we've indicated that when a medical opinion stands uncontradicted and that that's the that's the key. When a medical opinion stands uncontradicted, a circumstantial critique by non physicians, in this case, the administrative law judge. However, thorough or responsible in this case, we say was not must be overwhelmingly compelling in order to overcome it. And Dr. Hargraves opinion was the only one reference. And in this case, we double it. We have both the examiner who had whatever records they had and the non examiner who did both with their. Expert psychiatric training, otherwise the commissioner would not want them indicated we had a severe impairment, moderate to moderate impairments. You heard you heard Mr. Jewett say that Dr. Tala only had certain records up to a certain time. And he suggests that all the records after that time show that she was doing fine. That that was his argument. Right. So and certainly and certainly we have set forth in our brief, you know, it's it's it's like what the court had said with respect to the testimony. You know, she said, I'm doing well. But then she she clarified that by doing well, she means that she only has panic attacks. Now, two to three times a month that last for a couple of days. And when she there are also records after that time that Dr. Butler apparently did not have that also show that she's up and down and right. Right. And that was a point that I was going to start to make is that, again, as we said, with respect to the work activity, it is up and down because part of it is if she's doing some work activity that's analogous, although it's not equal to work, she gets worse. And then again, with with all the conditions, all psychiatric conditions, but especially something like bipolar, that's exactly what it is. Good days, bad days, good periods of time during a day, bad periods of time. Does she go to see the doctor on a day when her symptoms when her condition is not terribly active? She's doing well. If she goes to see the doctor on a day where it's it's it's been a little bit worse, then it's a little bit worse. But that's exactly our argument. And even if I'm sorry, forgive me. That's OK. Here's my concern. I mean, so are you asking for a rule that basically says that as long as there is a doctor that says somebody is severely or moderately affected, that there's nothing an ALJ can do to to stop this at the step two? Well, as you know, as as counsel for the commissioner indicated, it is case specific. In this particular case, we have not one, but we have two. And even with two, as the court set forth in Giddings, if there is overwhelmingly compelling evidence, a non physician such as an ALJ can overcome it. But the problem is we don't even come close in this case because she has periods of time where she is very limited in her activities. And and and it coincides especially with when she is doing some work that is not work in the sense of a step five decision in social security, but is at least analogous. That's when she gets worse. And at best, it's it's only part of the time that she's doing well. Yes, there are times she goes to the doctor that she is doing well, but then there are times where it's much worse. And again, I you know, we set it forth so many periods of times where she's anxious, not being able to concentrate throughout the entire record. So there is not the standard met. But no, your honor, we don't ask for for, you know, if there's one opinion that says that that that a person is something that that has to be accepted. But in this case, there's not sufficient evidence to allow a lay person to overcome it. I'm sorry. The ALJ basically said that the treatment records established that the claimants counseling services from November 2014 to July of 2017 were overwhelmingly benign and that her psychiatric symptoms improved from mild to minimal to non-existent. You're disagreeing with that characterization, right? You're saying that that's not an accurate characterization of the treatment records. Right. Well, it forgive me. There are a couple of things at a worst at a worse, worse, worse, worse, worse. The ALJ would still have to even if they find in 2017 when she's having panic attacks, et cetera, that that she doesn't need it, then you still have any period. And if there's a period of one year or more, she's entitled to those benefits. So I think it has to start with the ALJ going back, finding the de minimis condition that does exist and then going through it in a way that this court can follow the administrative law judge's reasoning in terms of exactly what the administrative law judge accepted. What they didn't accept. And that's not present in this case. Well, I guess the general standard we allow ALJs to resolve genuine conflicts and medical evidence. And so is your point that there's not really a genuine conflict in the medical evidence that there's two doctors who say that she's moderate or more and the treatment records don't support a contrary finding? That's your argument, right? Our argument is that it's the opposite of what the commissioners council said in general. In general, that the administrative law judge, we defer to the administrative law judge. But in deferring to the administrative law judge, the administrative law judge has to defer to the uncontradicted opinions. So it's almost flipped on its head in making the determination. We defer to the ALJ. But in making the determination, the ALJ is a lay person has to defer unless it's overwhelmingly compelling. So we're not saying that in the absence of an opinion or if there was one opinion one way or one opinion the other way, the treatment notes could have supported the administrative law judge picking one or the other. What we're saying is that the ALJ, when we defer to him, he has to then defer to the uncontradicted opinions. In this case, not just one as there wasn't gettings, but two who both say that it's at least a de minimis opinion. Right. But in Australia, here's the quote from Australia. We frequently caution that ALJ should not rely heavily on the findings of consultative positions after a single examination. This concern is even more pronounced in the context of mental illness or a one time snapshot may not be indicative of longitudinal mental health. So. Doesn't that diminish the weight of Dr. I don't think so, judge. And this is why in Estrella, in Flynn and Stacey, they're talking about how if one opinion, the judge has one opinion from a non examiner or an examiner or even both, as opposed to a treating physician's opinion who sees the claimant on an ongoing regular basis that they defer to the treating opinion. We have records. We don't have a treating opinion. So that's where getting says and getting even acknowledges. We recognize, of course, that the examiner only examined gettings once and is not entitled to the deference of a treating physician. They not that your court acknowledges that. But then it says if there's only the opinion of, in that case, an examiner, that it has to be overwhelmingly compelling. And again, in this case, we have we have two. So it's it's a matter of you have two consistent opinions. They're the only opinions in order to overcome that. It's not a matter of can you look at the records and come to one conclusion? It's can you look at the records and only come to one conclusion such that no one could possibly agree with the examiner and the non examiner? We've gone way over. Can I just ask you to respond quickly to something? Mr. Jewett said about Dr. Slowak's statements about your client having intellectual functioning below average and markedly impaired attention and concentration, which seemed to be at odds with some of the treatment providers. Yeah, I forgive me. I must let me see if I can. I did not examine that one particular part because she also she saw a thought process that was disorganized. The examination revealed a thought process that was disorganized. So that has nothing to do with intellect. It was difficult to follow the claimant in conversation as she would respond to a question for a moment and then just completely go off task. And it was attention and concentration were markedly impaired due to the claimant's distract ability. So and she also puts a limited intellectual functioning. We don't know whether you know how much limited, but it's markedly impaired due to the the claimant's distract ability. And she also indicates moderate intermittent doing simple tasks. And we don't really we didn't even raise that because, as the court says, there's not a lot one way or the other on intellect. But the but she certainly observed the disorganized thought process. She observed that you would ask the claimant one thing, you know, you know, what color is the sky? And she respond, I like your shoes. You know, if she wouldn't respond appropriately and then she would completely go off on a tangent. And she specifically says markedly impaired due to the inability to concentrate due to the distract ability. So even if you take out the limited education, you know, you can argue you can make a lot of arguments. OK, then it's only moderate, but you still have moderate. And maybe she really meant the market was because that's what she observed. She observed the inability to even, you know, have a conversation that made sense. Any other questions for Mr. Gorton? No. All right. Well, thank you both. We will reserve decision. Well argued. We certainly got our money's worth in terms of time and I appreciate the effort that went into it. So thank thank you. Let me thank also all the staff that make sure that this zoom operation works as smoothly as it did today. That includes, of course, our technical people and our courtroom deputy. And so is Rodriguez. You can now adjourn the court. Course, that's adjourned.